366 S.E.2d 731

**STATE of West Virginia**

v.

**Virgil McCOY.**

**No. 17487.**

Supreme Court of Appeals of West Virginia.

Feb. 23, 1988.

Silas B. Taylor, Dist. Atty. Gen., Charleston, for State.

R. Lee Booten, II, Huntington, for McCoy.

BROTHERTON, Justice:

Virgil McCoy appeals his May 2, 1985, conviction of second degree sexual assault, W.Va.Code § 61–8B–4 (1984), following a jury trial in Cabell County. Because we find that the lower court erred in admitting certain expert testimony, we reverse and remand for a new trial.[1]

On September 10, 1984, Virgil McCoy was drinking beer with his brother and cousin at a tavern on the west side of Huntington. While he was there, Anneta Dawn Booth, the alleged victim in this case, entered with a friend, Patsy Jean Roy. McCoy and Booth knew one another through Booth's friendship with McCoy's wife, who at that time was separated from McCoy. After the five drank a round of beer, the two women left to go to a second tavern, the Valhalla. McCoy and his companions joined Booth and Roy there.

Booth agreed to give McCoy a ride home, and Booth, McCoy, and Roy left the Valhalla at approximately 4:00 a.m. on September 11, 1984. After dropping Roy off at her apartment, Booth drove to a nearby car wash, where she did figure eights around the vacuum pumps. Then, either McCoy or Booth put the car in park, and Booth and McCoy talked and kissed. McCoy testified that this was a voluntary act. Booth testified, however, that McCoy forced himself on her despite her complaints and continued directions to stop. McCoy eventually stopped and apologized, and Booth took him to his residence. Booth then went home.

At approximately 9:30 a.m. on September 11, 1984, McCoy knocked at Booth's door and invited himself in for coffee. Booth was wearing a short wrap-around robe.

---

1. Other errors raised by the appellant are without merit, and we do not address them in this opinion.

After McCoy finished his coffee, he and Booth went into the bedroom and engaged in sexual intercourse, with Booth in the top position. At trial McCoy denied that he used force during the act and testified that Booth did not ask him to stop. Booth, however, testified that McCoy pulled her into the bedroom, pushed her down on the bed, removed her clothes, then flipped her on top of him and forced her to have intercourse. Booth testified that she screamed and begged him to stop, but did not bite him and did not recall leaving any scratch marks on him.

After McCoy left her home, Booth testified that she showered and went to her sister's (Monica Booth's) residence. Monica Booth testified that her sister's face was swollen and bruised. Monica Booth also testified that she observed red marks on Booth's breasts. Booth did not relate to her sister what had happened.

Later that day, at approximately 6:00 p.m., Booth told a friend, Roger Johnson, that she had been sexually assaulted by McCoy. Then at approximately 12:30 a.m. on September 12, 1984, Booth told her boyfriend, Ronnie Grobe, of the incident. Grobe, a police officer, persuaded Booth to tell the police, and at approximately 3:00 a.m. on September 12, 1984, Booth filed a report with the Huntington Police Department. Booth was interviewed by Detective Darrell Black, who testified that he observed abrasions on Booth's lower lip and small bruises under her left ear. Detective Black also testified that Booth appeared very emotional and very upset. On November 19, 1984, the Cabell County Grand Jury returned an indictment against Virgil McCoy charging him with Second Degree Sexual Assault, W.Va.Code § 61–8B–4 (1984).

The trial began on April 24, 1985. On the second day of the trial, the prosecution called Lauren McKeown as an expert witness. After hearing her qualifications, the trial court granted the prosecution's motion that McKeown be qualified as an expert to give an opinion "as to the victim's reactions subsequent to the alleged assault." McKeown testified about common behavior

of rape victims, and gave her opinion about whether Booth's actions after the incident conformed with typical post-rape behavior.

## I.

■ McCoy argues first that the lower court erred in finding that McKeown was qualified as an expert to testify about the behavior of rape victims. Rule 702 of the West Virginia Rules of Evidence governs testimony by experts. Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

McKeown was, at the time of trial, assistant director of the Branches Domestic Violence Shelter in Huntington, West Virginia, a shelter for battered women and children. She was also co-founder and coordinator of the Rape Crisis Counseling Team, which assists sexual assault victims. McKeown held a bachelor's degree in sociology and a master's degree in community agency counseling. She had received training in rape crisis counseling and had worked previously for the Rape Victim Companion Program in Winchester, Virginia, and with the Women's Center at Marshall University in Huntington, West Virginia, dealing with sexual assault victims. She had attended conferences on the subject and read current literature. She had experience with over one hundred cases of sexual assault or sexual abuse. We find that McKeown had sufficient knowledge, training, and experience to qualify under Rule 702 as an expert in the rape counseling area and that the trial court did not err in so ruling.

## II.

Over the objections of McCoy's lawyer, McKeown testified about Booth's behavior subsequent to the alleged assault. McKeown concluded that Booth's behavior subsequent to the alleged assault, including her delay in telling anyone and the

taking of several showers after the incident, were in conformity with that of someone who had been sexually assaulted. McKeown concluded further that Booth was "still traumatized by this experience."[2]

We have not had an occasion to consider the admissibility of expert testimony on post-rape behavior. Such behavior is often referred to as "rape trauma syndrome," a term coined in 1974 to describe certain physical and emotional symptoms experienced by rape victims. *See* Burgess & Holmstrom, *Rape Trauma Syndrome*, 131 Am.J. Psychiatry 981 (1974).[3] Burgess and Holmstrom describe rape trauma syndrome as an acute stress reaction to a life-threatening situation, usually occurring as a two-phase reaction. During the first phase, the acute phase, the victim experiences a great deal of disorganization in her life-style. The acute phase is characterized by certain physical and emotional reactions, including fear, humiliation, anger, revenge, and self-blame. The acute phase is followed by the "long-term process" or "reorganization phase," characterized by tendencies to change residences and telephone numbers and to turn to family members for support.[4]

In her testimony describing behavior characteristic of sexual assault victims, McKeown did not use the term "rape trauma syndrome" or discuss it as described by

Burgess and Holmstrom. We, however, realize that admissibility of expert testimony on post-rape behavior should not necessarily turn on whether or not the expert uses the term "rape trauma syndrome." *See State v. Black*, 109 Wash.2d 336, 745 P.2d 12 (1987); *State v. Huey*, 145 Ariz. 59, 699 P.2d 1290, 1294 (1985).

Courts that have considered the issue disagree as to the admissibility of expert testimony on rape trauma syndrome or on post-rape behavior generally in a rape prosecution where consent is the issue. One of the first courts to consider this issue was the Supreme Court of Kansas in *State v. Marks*, 231 Kan. 645, 647 P.2d 1292 (1982). The defendant in *Marks* argued that such testimony should be *per se* inadmissible where consent is the issue because it invades the province of the jury. *Id.* 647 P.2d at 1299. The *Marks* court reasoned that rape trauma syndrome testimony did not invade the province of the jury because it was "merely offered as any other evidence, with the expert subject to cross-examination and the jury left to determine its weight." *Id.* The *Marks* court, therefore, concluded that "[w]hen consent is the defense in a prosecution for rape qualified expert psychiatric testimony regarding the existence of 'rape trauma syndrome' is relevant and admissible." *Id.* at syl. pt. 8.[5]

Questioning the scientific reliability of rape trauma syndrome, in *State v. Salda-*

**2.** McKeown testified in part as follows:
> Mr. Hatcher: In your talking to the victim in this case, do you in your opinion feel that she is still traumatized by this experience?
> Mr. Means: I object.
> The Court: Overruled.
> McKeown: Yes.
>
> Record at 215–16.

At the time of her testimony, McKeown had met with Booth on two occasions. McKeown spoke with Booth for the first time on the day before trial and again on the day of McKeown's testimony. McKeown had not reviewed the statement Booth had given to the police within forty-eight hours of the alleged assault.

**3.** *See generally* McCord, *The Admissibility of Expert Testimony regarding Rape Trauma Syndrome in Rape Prosecutions*, 26 B.C.L.Rev. 1143, 1144–48 (1985).

**4.** Rape trauma syndrome is not mentioned as a diagnostic entry in the American Psychiatric Association's *Diagnostic and Statistical Manual*

*of Mental Disorders* (3d ed. 1980) (DSM–III), a widely recognized reference for diagnosing mental disorders. The American Psychiatric Association recognizes rape as only one potential cause of Post-traumatic Stress Disorder. *See DSM–III* at 236. "The essential feature [of Post-traumatic Stress Disorder] is the development of characteristic symptoms following a psychologically traumatic event that is generally outside the range of usual human experience." *Id.* Other potential causes of Post-traumatic Stress Disorder include car accidents, airplane crashes, floods, earthquakes, military combat and torture. *Id. See generally* Buchele & Buchele, *Legal and Psychological Issues in the Use of Expert Testimony on Rape Trauma Syndrome*, 25 Washburn L.J. 26 (1985).

**5.** *Accord State v. Huey*, 145 Ariz. 59, 699 P.2d 1290 (1985). The Supreme Court of Arizona held in *State v. Huey* that "if properly presented by a person qualified by training and experience such as a psychiatrist or psychologist, [rape trauma syndrome] evidence is admissible to

*na,* 324 N.W.2d 227 (Minn.1982), the Supreme Court of Minnesota held that expert testimony concerning post-rape behavior was inadmissible. The *Saldana* court stated, "[t]he scientific evaluation of rape trauma syndrome has not reached a level of reliability that surpasses the quality of common sense evaluation present in jury deliberation." *Id.* at 230.[6] The *Saldana* court also found that the lower court had erred in admitting the expert's conclusion that the complainant had been raped. The Minnesota court stated that to be admissible, expert testimony must be helpful to the jury. The *Saldana* court concluded that the expert's conclusion that the complainant had been raped was not helpful to the jury "[b]ecause the jurors were equally capable of considering the evidence and determining whether a rape occurred." *Id.* at 231.

Similarly, in *State v. Taylor,* 663 S.W.2d 235 (Mo.1984), the Supreme Court of Missouri excluded testimony concerning rape trauma syndrome on the ground that it was not helpful to the jury. In *Taylor,* a psychiatrist specializing in diagnosis and treatment of rape victims was permitted to testify that the victim of the alleged rape suffered from rape trauma syndrome and "comment further, albeit implicitly," that the rape trauma syndrome behavior referred to resulted from the incident with the defendant. Like the Minnesota court in *Saldana,* the *Taylor* court stated that expert testimony should never be admitted unless it is clear that the jurors themselves are incapable of drawing correct conclusions from the facts proved. The *Taylor* court then stated that the only issue in the

case was whether the intercourse was forcible or consensual and reasoned that:

> [t]he jury could determine whether the intercourse was forcible based on its own evaluation of the physical evidence and testimony and credibility of the witnesses. There is a risk that the jury will regard the expert's opinion that a victim suffers from rape trauma syndrome resulting from forcible assault as dispositive on the issue of consent.

*Id.* at 241. The *Taylor* court, therefore, concluded that under the circumstances of that case, the expert "went too far in expressing his opinion that the victim suffered rape trauma syndrome as a consequence of the incident with the defendant...." *Id.* at 241. The court went on to say that:

> [u]nder the qualifications given, the most that [the psychiatrist] could legitimately state would be that the prosecutrix' symptoms were consistent with a traumatic experience—even a stressful sexual experience. But it goes beyond his qualifications to say that she was raped by defendant at Mary's Moonlight Lounge. That's indeed a chasm too wide and deep to leap.

*Id.* at 241. Following the lead of *Taylor* and *Saldana,* in *People v. Bledsoe,* 36 Cal.3d 236, 203 Cal.Rptr. 450, 681 P.2d 291 (1984), the Supreme Court of California concluded that "expert testimony that a complaining witness suffers from rape trauma syndrome is not admissible to prove that the witness was raped." *Id.* 203 Cal. Rptr. at 460, 681 P.2d at 301.[7]

Citing *Saldana, Taylor,* and *Bledsoe,* in *State v. McQuillen,* 236 Kan. 161, 689 P.2d 822 (1984), the Supreme Court of Kansas

---

show lack of consent." Like the court in *Marks,* the *Huey* court reasoned that such testimony would not invade the province of the jury because "[t]he expert would be subject to cross-examination and the jury could then determine what weight the evidence is to receive." *Id.* 699 P.2d at 1294. *See also State v. Liddell,* Mont., 685 P.2d 918 (1984). In *State v. Liddell,* the Supreme Court of Montana concluded:

> Psychiatric testimony is admissible to aid a jury in determining whether there was consent to engage in a sexual act which all parties agreed occurred. It remains up to the jury to determine whether the evidence is credible. *Id.* at 923.

6. *Accord State v. Black,* 109 Wash. 336, 745 P.2d 12 (1987). Citing *Saldana,* the Supreme Court of Washington excluded rape trauma syndrome testimony because "expert testimony on rape trauma syndrome is not a scientifically reliable means of proving lack of consent in a rape case." *Id.* 745 P.2d at 18.

7. The *Bledsoe* court added:

> Even when the expert stops short of expressing an opinion on the ultimate issue of whether the complaining witness was raped and, as here, states simply that the witness is suffering from "rape trauma syndrome," the use of this terminology is likely to mislead the

modified its earlier holding in *Marks* by emphasizing that an expert may testify only as to the *existence* of rape trauma syndrome. Citing facts from *Marks*, the court made it clear that expert opinion that a victim had been raped was improper: "[the psychiatrist] never stated that the victim was raped or that the stress which caused her disorder was the result of a rape. He also did not testify that the cause of the victim's disorder was intercourse with the defendant." 689 P.2d at 829. *Cf. People v. Hampton*, Colo., 746 P.2d 947 (1987). In *Hampton*, the Supreme Court of Colorado admitted rape trauma syndrome testimony for the limited purpose of explaining the rape victim's delay in reporting the incident. Like the Kansas court in *McQuillen*, the *Hampton* court stressed that the expert expressed no opinion as to whether the victim was raped. The court stated:

> The expert's testimony was limited in scope. She testified concerning the reactions of rape victims generally; none of her testimony concerned this particular victim. She did not interview or contact the victim and did not testify that the victim suffered from rape trauma syndrome or that the victim had been raped. Nor did she express an opinion as to the truthfulness of the victim.

*Id.* at 951.

The common thread running through *Saldana, Taylor, Bledsoe, McQuillen,* and

*Hampton* is that expert testimony on rape trauma syndrome is not admissible to show whether or not the complainant was, in fact, raped. The danger involved in permitting an expert to conclude that because a complainant suffers from rape trauma syndrome, the complainant was, therefore, raped is that "[such a] conclusion vouches too much for the victim's credibility and supplies verisimilitude for her on the critical issue of whether defendant did rape her." *Taylor*, 663 S.W.2d at 241.[8] There is the danger that the jury will place too much emphasis on the testimony of the witness because of his or her status as an expert:

> [p]ermitting a person in the role of an expert to suggest that because the complainant exhibits some of the symptoms of rape trauma syndrome, the complainant was therefore raped unfairly prejudices the appellant by creating an aura of special reliability and trustworthiness.

*Saldana*, 324 N.W.2d at 231.

■ Having reviewed decisions from the courts which have considered the admissibility of rape trauma syndrome testimony, we now turn to the case before us. Expert testimony that helps the jury to understand the evidence or determine a fact in issue is admissible under W.Va. Rule Evid. 702.[9] We agree with the Supreme Court of Kansas that in a prosecution for rape where

jury into inferring that such a classification reflects a scientific judgment that the witness was, in fact, raped.
*Bledsoe*, 203 Cal.Rptr. at 460 n. 14, 681 P.2d at 301 n. 14.

8. *Accord State v. Brodniak*, Mont., 718 P.2d 322 (1986) (rape trauma syndrome testimony admissible where testimony does not improperly comment on victim's credibility).

9. We recognize that some jurisdictions have employed the test for admission of expert scientific testimony set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), as the standard for determining the ·admissibility of rape trauma syndrome evidence. *See, e.g., State v. Black*, 109 Wash. 336, 745 P.2d 12 (1987). The *Frye* court set forth the following standard for admission of expert testimony on scientific evidence:
> [W]hile the courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery,

the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
*Frye*, 293 F. at 1014. However, in *People v. Hampton*, Colo., 746 P.2d 947 (1987), the Supreme Court of Colorado recognized that:
> The *Frye* court was concerned with the admission of the results of a systolic blood pressure deception test. Generally, the *Frye* test is applied to novel scientific devices and processes involving the manipulation of physical evidence including lie detectors, experimental systems of blood typing, voice prints, identification of human bite marks, and microscopic analysis of gunshot residue.

*Hampton*, 746 P.2d at 950–51. (footnote omitted). We agree with the Supreme Court of Colorado in *People v. Hampton* that Rule of Evidence 702, rather than *Frye*, should govern the admissibility of rape trauma syndrome testimony. *See Hampton*, 746 P.2d at 951.

consent is the defense, qualified expert testimony regarding the existence of symptoms consistent with rape trauma syndrome is relevant and admissible. *See* syl. pt. 4, *State v. McQuillen*, 236 Kan. 161, 689 P.2d 822 (1984). It is well settled in this State, however, that the jury is the sole judge as to the credibility of witnesses. *See, e.g.*, syl. pt. 2, *State v. Bailey*, 151 W.Va. 796, 155 S.E.2d 850 (1967). We, therefore, must draw a distinction between an expert's testimony that an alleged victim exhibits post-rape behavior consistent with rape trauma syndrome and expert opinion that bolsters the credibility of the alleged victim by indicating that she was indeed raped.

When McKeown took the stand as an expert, she did not limit her testimony to the behavior of sexual assault victims, generally. Nor did she limit her testimony to an opinion that Booth's behavior was in conformity with behavior of others she had treated as victims of sexual assault. Rather, McKeown concluded that Booth was "still traumatized by this experience." Her reference to *this* experience was tantamount to an opinion that Booth had, in fact, been raped by the defendant. Her testimony amounted to a statement that she believed the alleged victim, and by virtue of her expert status she was in a position to help the jury determine the credibility of the most important witness in a rape prosecution. McKeown's conclusion that she believed that Booth had been raped "encroach[ed] too far upon the exclusive province of the jury to weigh the credibility of the witnesses and determine the truthfulness of their testimony," *McQuillen*, 689

P.2d at 834 (Schroeder, C.J., dissenting), and should have been excluded. We, therefore, hold that qualified expert testimony regarding rape trauma syndrome is relevant and admissible in a prosecution for rape where the defense is consent. The expert may testify that the alleged victim exhibits behavior consistent with rape trauma syndrome, but the expert may not give an opinion, expressly or implicitly, as to whether or not the alleged victim was raped.[10] In this case, the expert's conclusion that Booth was "still traumatized by this experience" was an implicit conclusion that she had been raped. We, therefore, find that admission of her testimony was reversible error.

A further problem in this case is the credibility of the expert. Her testimony was based on two interviews with the alleged victim, both occurring on the eve of trial, when considerable time had passed since the incident. Where the expert has no immediate contact with the victim of an alleged rape, it is possible for the victim to fabricate post-rape behaviors consistent with rape trauma syndrome. Under these circumstances, McKeown's testimony had the potential to confuse and mislead the jury in making a factual determination as to whether Booth was raped. The lay jurors were capable of determining, based on the other evidence presented, whether they believed Booth was raped.[11] In this regard we note that admissibility of expert testimony depends, in each case, on the particular evidence offered, and evidence which is misleading or confusing should be excluded.[12] "Under W.Va.R.Evid. 702, a trial

10. We realize that the line drawn between admissible and inadmissible testimony is a fine one, and we therefore encourage trial courts to guard jealously the province of the jury by way of admonition to counsel and witnesses, cautionary instructions to the jury, etc.

11. Prior to McKeown's testimony, the jury heard testimony from Booth, her friends and relatives, and a police officer as to both the alleged victim's physical condition and emotional behavior subsequent to the incident.

12. We note that at least one court has limited admission of rape trauma syndrome evidence to testimony from a psychiatrist. *See McQuillen*,

689 P.2d at 829. We think the better view is that in determining whether a witness is qualified as an expert to testify regarding rape trauma syndrome, the emphasis should be on the expertise of the witness, rather than on his or her title or academic degrees. *See* McCord, *The Admissibility of Expert Testimony Regarding Rape Trauma Syndrome*, 26 B.C.L.Rev. 1143, 1200 (1985). However, where, as in this case, the witness is a rape counselor, the trial court should evaluate the witness with extreme care. While we acknowledge that a rape counselor with proper training and experience may qualify as an expert regarding rape trauma syndrome, we recognize that a counselor is likely to

judge has broad discretion to decide whether expert testimony should be admitted, and where the evidence is unnecessary, cumulative, confusing or misleading the trial judge may properly refuse to admit it." Syl. pt. 4, *Rozas v. Rozas*, 176 W.Va. 235, 342 S.E.2d 201 (1986). Therefore, in determining whether a witness should be qualified as an expert regarding rape trauma syndrome, we urge the trial court to evaluate carefully the expertise of the witness in view of the particular facts and circumstances of each case.

For the foregoing reasons, we reverse the judgment of the Circuit Court of Cabell County and remand for a new trial.

Reversed and remanded.

sympathize with the victim and tend, consciously or subconsciously, to testify in a way that supports a finding of guilt. Because the function of rape counselors is to help the victim, they generally do not probe inconsistencies in their clients' descriptions of the facts relating to the incident. *See Bledsoe,* 203 Cal.Rptr. at 459,

681 P.2d at 300. This observation is not intended to impugn the integrity of rape counselors, who perform a vital role in treating the victims of a prevalent social problem, but is meant rather to point out a natural bias that may run counter to the fact-finding function of a jury trial.